Houston Street Management Co., 
 Petitioner-Landlord-Respondent,
against
Suzanne La Croix, Respondent-Tenant-Appellant.



Tenant appeals from a final judgment of the Civil Court of the City of New York, New York County (Laurie L. Lau, J.) entered November 17, 2014, after a nonjury trial, which granted landlord possession in a holdover summary proceeding.




Per Curiam.
Final judgment (Laurie L. Lau, J.) entered November 17, 2014, affirmed, with $25 costs.
We agree that landlord met its burden of establishing, by a preponderance of the evidence, that tenant did not maintain her primary residence at the subject Manhattan apartment during the relevant period prior to the May 31, 2011 expiration of her last renewal lease (see Glenbriar Co. v Lipsman, 5 NY3d 388 [2005]). The record shows, and it was essentially undisputed, that tenant was absent from the apartment for a nine-month period through December 2010; that upon her return to New York in January 2011, she advised landlord that she would be "relocat[ing]" to a "fully furnished rental," at a specified Florida address (8016 Country Club Drive, Brooksfield), and sought permission to sublease the Manhattan apartment to one "David Ettinger" for a period of two years, stating that "it is possible that I may never be able to return." It was also uncontested that tenant was absent from the apartment for a two-year period from October 2005 through September 2007, when she worked and resided in Florida (see 615 Co. v Mikeska, 75 NY2d 987 [1990] [appropriate for court to evaluate entire history of tenancy in considering issue of primary residence]). 
In addition, the documentary evidence showed that tenant's banking and checking account records (JP Morgan/Chase) listed various Florida addresses from April through December 2010. Moreover, these banking records showed that tenant made monthly deposits of rent checks received from her Manhattan subtenant, Ettinger, prior to January 2011, thereby demonstrating that tenant was (illegally) subletting the apartment to Ettinger months before she sought landlord's permission. The documentary evidence also showed that tenant opened a Florida checking account in August 2010 and drew various checks on that account, including monthly rent checks for her Florida sublet (at 8003 Country Club Drive) from September through December 2010, and an $800 check dated October 22, 2010, as a "deposit on [her next Florida] rental [at] 8016 Country Club." The Verizon wireless account for tenant's cellphone was in the name of "Ruby Morgan" with a Scarsdale, New York, billing address, and the 2010 monthly statements showed calls originating in Florida for a period of over eight months. On this record, the trial court was fully justified in concluding that tenant "was away from the apartment prior to renewal of [her last] lease and for most of its duration" and that she "essentially had lived in Florida since 2005."
The trial court was also fully warranted in rejecting the medical and other excuses offered by tenant. The court, which had the opportunity to see and hear tenant, and observe her demeanor, characterized her testimony as "fraught with considerable contradictions" and "not credible." Moreover, tenant failed to offer any objective evidence of medical treatment and physical therapy purportedly received in Florida and, indeed, tenant's attorney informed this court at oral argument that she had no intention of offering tenant's medical records into evidence at trial.
While the dissent makes much ado about the trial court's purported rejection of certain documents, in reality, the sum total of this evidence was (1) a wholly inadmissible, two-sentence, unsworn, unaffirmed letter from tenant's doctor addressed to "whom it may concern," and (2) a HIPPA authorization, submitted without any accompanying medical records. Given the lack of any probative value of these documents, their exclusion from evidence was harmless, and the error, if any, may be disregarded. 
In addition, tenant's belated attempt to present a 2010 Medicare statement - after she had submitted, in opposition to landlord's prior discovery motion, a sworn affidavit to the court that she "absolutely provided every single document in [her] possession" - was properly rejected. The trial court correctly noted that landlord "was entitled to rely upon her sworn statement, having been made after reflection and a diligent search for documents responsive to its disclosure request, that all documents responsive to the request had been disclosed." We note, in any event, that the purported Medicare statement was not marked as an exhibit or presented to the trial court and therefore, not part of the record on appeal (see Dani Michaels, Inc. v Design 2000, NY, 4 AD3d 193 [2004]; Bindler v Brown, 133 AD2d 602 [1987]). "Documents or information that were not before [the trial court] cannot be considered by this Court on appeal" (Matter of De Cotis v Malinoski, 252 AD2d 646, 647 [1998]).
[D]ue regard must be given to the decision of the Trial Judge who was in a position to assess the evidence and the credibility of the witnesses" (Universal Leasing Services v Flushing Hae Kwan Rest., 169 AD2d 829, 830 [1991]). Based on the documentary and credited testimonial evidence presented, it cannot be said that Civil Court's decision was not a fair interpretation of the evidence. Although the dissent would make an entirely new set of findings, it does so by crediting tenant's testimony - that the trial court squarely rejected as incredible - and material outside the record. The dissent also raises legal arguments that were not advanced by the parties and should therefore not be considered. "We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made" (Misicki v Caradonna, 12 NY3d 511, 519 [2009]). While appellate judges do not sit as automatons, neither are they freelance lawyers (see Misicki, at 519).
I concur I concur I concur
Doris Ling-Cohan, J.
Dissenting Opinion
I respectfully dissent and vote to reverse, as the trial court's determination that this 40-year rent stabilized tenant of advanced years, with serious medical issues, "did not maintain a nexus to the apartment during the relevant period of inquiry prior to the expiration of [tenant's] [*2]last lease" is unsupported, "under any fair interpretation of evidence" (409-411 Sixth St., LLC v Mogi, 22 NY3d 875, 876-877 [2013], quoting Claridge Gardens v Menotti, 160 AD2d 544, 544-545 [1st Dept 1990]). 
It is well settled that a tenant's absence from a rent-stabilized premises for medical treatment constitutes a reasonable excuse for purposes of primary residence analysis and entitles the tenant to the safe harbor protection of Rent Stabilization Code (9 NYCRR) § 2523.5(b)(2)(see Hudson St. Equities Group v Escoffier, 11 Misc 3d 63, 64 [App Term, 1st Dept 2006], affd 45 AD3d 371 [1st Dept 2007]; Hudsoncliff Building Co. v Houpouridou, 22 Misc 3d 52 [App Term, 1st Dept 2008][reversal by this court determining that tenant had a sufficient nexus and did not abandon subject apartment, despite spending considerable time in Greece caring for her ailing mother, her brother's subsequent illness and her own accident]). Moreover, an absence may be deemed excusable, if the record shows that "there was no abandonment of the premises or establishing of any new residence" (Katz v Gelman, 177 Misc 2d 83, 84 [App Term, 1st Dept 1998]). Nevertheless, "[t]he ultimate burden of persuasion remains on the landlord seeking eviction on the basis of nonprimary residence" (Patchin Place v Fox, 3 Misc 3d 127[A][App Term, 1st Dept 2004]).
Landlord Failed to Meet its Burden and its Evidence Supports Tenant's Medical Excuse
Here, landlord did not meet its initial burden of proving by a preponderance of the evidence that tenant does not occupy the subject apartment as her primary residence, or that she maintains a primary residence at a place other than the subject premises (see Glenbriar Co. v Lipsman, 5 NY3d 388, 392 [2005]; Sharp v Melendez, 139 AD2d 262 [1st Dept 1988]). Moreover, tenant's unrebutted trial testimony showed that there was no abandonment and that her temporary absence from April 2010 through December 2010, living for short periods of time in a friend's apartment or a series of furnished, short-term rentals, was due to medical reasons (primarily a knee replacement surgery performed in Florida by a physician who had previously treated tenant for an arthritic condition, and that subsequent to the surgery and rehabilitation period, tenant tripped and sustained an injury to that kneecap, which required an extended two-month stay in Florida).


Medical Documentation

Notwithstanding the landlord's failure to sustain its initial burden and tenant's unrefuted testimony, the trial court erred by impermissibly shifting the burden of proof to tenant on the issue of a "nexus", essentially finding that tenant failed to prove her absence for medical reasons, by not proffering medical "documentation" - couching such shift as a "credibility finding", and improperly based such "credibility finding" on a perceived "absence of written proof of surgeries and rehabilitation during discovery and then during the trial." The absence of documentary evidence, however, has been held not to be a dispositive factor (see 300 E. 34th St. Co. v Habeeb, 248 AD2d 50, 55 [1st Dept 1997]; 23 Jones St. Assoc. v Keebler-Beretta, 284 AD2d 109 [1st Dept 2011]). Moreover, having already made an adverse evidentiary sanction barring the very documentation (Medicare medical statements) which would have supported tenant's medical excuse, it was further error for the trial judge to then continue to sanction tenant by basing her credibility findings largely on a claimed "absence" in the record, while excluding from consideration and discounting the unrefuted documentary evidence submitted by tenant, which [*3]showed a substantial nexus to the New York apartment, including cable, internet and telephone bills, Sun Pass records [FN1]
, pension, retirement, student loan and other financial statements. These records all listed the New York apartment's address, as did other documentary evidence submitted by the landlord (as discussed below), and, in fact, supported tenant's medical treatment in Florida.
The alleged "absence" of documentation, upon which the trial judge largely based her "credibility" finding, was simply because the trial court refused to permit pertinent documentary evidence proffered by tenant (in the form of a Medicare medical statement for 2010 which supported her assertion as to medical treatment in Florida). According to the trial court, the Medicare statement was the subject of tenant's "improper" conversation with her counsel during a lengthy adjournment of tenant's cross-examination (and the balance of the trial), which the court inappropriately regarded as a violation of the court's prior instruction that all contact between tenant and her counsel during cross-examination be prohibited. While the trial court possesses broad authority to control the courtroom and rule on the admission of evidence (see Feldsberg v Nitschke, 49 NY2d 636, 643-644 [1980]), given the extremely lengthy one-month adjournment of cross-examination, both the court's instruction to bar all contact between counsel and her client (even if not covering tenant's testimony), and the court's subsequent exclusion of the Medicare records was an improvident exercise of its discretion (see Matter of Elmore v Plainview-Old Bethpage Cent. School Dist. Bd. of Educ., 273 AD2d 307 [2d Dept 2000]). Such error cannot be deemed harmless, insofar as it directly and primarily factored in the trial court's credibility findings, as specifically indicated in the court's decision. In effect, the judge sanctioned tenant twice, by first excluding relevant Medicare records, and then making an adverse credibility finding based upon tenant's "failure" to provide such excluded records as proof. It is noted that, at the time of the judge's instruction, when the issue of the Medicare records arose, tenant had not yet rested; nor could landlord claim surprise, since much of the cross-examination was focused on tenant's alleged "failure" to provide proof of her medical treatment in Florida and landlord's own submitted proof substantiated tenant's medical care in Florida.[FN2]
In fact, the court was advised by tenant's attorney that the housing court's own file contained documentation from the Florida treating physician, Dr. Richard Katz, which had been [*4]provided to the landlord, and indicated that "patient had a right total knee replacement on April 14, 2010" and that tenant "fell and injured her knee on May 31, 2010, requiring extended treatment with physician in Florida".[FN3]
At the conclusion of tenant's testimony, her attorney requested that the court take "judicial notice" of such medical evidence, which was not objected to by landlord, but the judge, nonetheless, denied the application because she was under the mistaken impression that tenant had rested, when the record clearly did not reflect that. Thus, the negative credibility finding largely based on the "absence" of medical documentation was further improper, since there was no objection and the court file itself contained additional supporting documentation of necessary medical treatment in Florida.
Moreover, the court's rejection of tenant's medical excuse for lack of "documentation" and its subsequent credibility finding against tenant also based on alleged "absence" of proof, was improper, since the record contained numerous references in the record to tenant's medical treatment in Florida, put forth as part of landlord's case, which was not properly considered by the trial court. Nor does the majority disclaim these references contained in the landlord's own case. For example, the records submitted on landlord's case reflect Dr. Lester Blair's (tenant's New York doctor) patient notes that: "[s]he is an s/p (R) TKR, [FN4] complicated by a broken patella. She is scheduled to have shoulder replacement in Fl[orida](Tampa Gen)", indicating that tenant's status, post her total right knee replacement, was complicated by a broken patella, requiring shoulder replacement surgery. Further, landlord's own subpoenaed witness, Medical Secretary Sarah Rossan, of Dr. Bruce Raphael's office (tenant's New York doctor), testified that she transcribed a message from tenant to Dr. Raphael that "I will be seeing Dr. Richard Katz, surgeon. He will be fixing my knee. That is my doctor at Oak Hill of Tampa. Please release a copy of my medical clearance letter. The doctors in New York really screwed up my appointments, so I've decided to go to Florida". Thus, landlord's own proof substantiates that tenant's absence was due to medical treatment in Florida, namely total knee replacement surgery, and the subsequent exacerbation of her condition (because of a later fall in Florida), and also shows that tenant sought treatment in Florida, given her negative experience with New York doctors. Notably, the majority fails to discuss this substantiating proof submitted by landlord, choosing, instead, to ignore it.
For the same reasons that a tenancy cannot be created by gamesmanship and artifice, a long-term, rent stabilized tenancy should not be forfeited via the same manner (see Berkeley Assoc. Co. v Revere Garage Corp., NYLJ, Oct. 22, 1981, at 6, col 4 [App Term, 1st Dept 1981]; Coleman v. Dabrowski, 163 Misc 2d 763 [App Term, 1st Dept 1994]). While justice may be [*5]"blind", it may not be deliberately blind to substantiated facts, which, here, establish tenant's necessary medical treatment in Florida, put forth by landlord, on its own prima facie case. 
While the majority focuses on tenant's attorney's claim at oral argument before this court that she need not have produced tenant's medical records into evidence at trial, counsel's statement was made in the context of her stressing that since landlord had not even made out a prima facie case and, in fact, landlord's own medical submissions substantiated tenant's medical claims, tenant had no need to submit any medical records.[FN5]
Further, "[i]t is a well-settled principle of equity that courts do not look favorably upon the forfeiture of leases" (2246 Holding Corp. v. Nolasco, 52 AD3d 377 [1st Dept 2008][citations omitted]; see also Dino Realty Corp. v. Khan, 46 Misc 3d 71 [App Term 2d Dept, 2d, 11th & 13th Jud Dists 2014][stating that "the law abhors forfeiture of leases" and that "it is the policy of New York State to prevent unnecessary evictions, particularly of rent-stabilized tenants" [internal citations omitted]).

Error as to Finding Absence "Since 2005"
The trial court's error as to its finding of an "absence" of medical documentation was compounded, by its conclusion that tenant was "mostly absent from the apartment since 2005" and that "as a whole, [tenant] essentially had lived in Florida since 2005", as this was not supported under any fair interpretation of the evidence. In fact, the judge's inaccurate factual finding of tenant's period of absence as "since 2005", was even directly contradicted, at trial, by landlord's documentary submissions, which demonstrated that, upon tenant's return to the New York apartment, once her legal sublet ended in 2007, tenant primarily resided at the subject apartment for an approximate period of over two (2) years (December 2007-January 2010); nor was this period of residence in the apartment seriously disputed by the landlord, in that landlord submitted telephone records of "Ruby Morgan" (which indisputably were those of tenant's),[FN6] evidencing that tenant lived in the subject apartment during this period (other than short term vacations for singing engagements and working as a nurse in Massachusetts on weekends).
Not disputed by the majority is the fact that the June 1, 2011 petition did not even allege abandonment as of 2005, with the earliest assertion being a claim that tenant failed to file tax returns in New York in 2007, and, instead, focused more on tenant being "rarely" observed "during the last year" (2010). Thus, despite tenant's unrefuted testimony and landlord's own documentary evidence, and the petition itself, the court's inappropriate factual finding that tenant was "mostly absent from the Apartment since 2005" is in direct conflict with the pleadings and evidence, and not supported by the record. Even the majority's recitation of dates, which were focused on the year 2010, shows that its and the lower court's conclusion that tenant "essentially [*6]had lived in Florida since 2005" has no evidentiary basis.
Additional Error

It was also error for the trial judge to focus on tenant's indisputably legal sublet of October 2005 through September 2007, for which tenant complied with the subletting provisions of the Rent Stabilization Law, and, to which landlord gave its express consent, as evidence of tenant's alleged "abandonment", because rent stabilized tenants in fact have an absolute right to sublet, under the law (Rent Stabilization Code [9 NYCRR] § 2525.6).[FN7]
This error by the trial court is particularly egregious given that it is undisputed that tenant returned to resume living in the New York apartment, when her legal sublet period had ended in 2007. Nor did the petition even claim the 2005-2007 legal sublet period, as proof of tenant's alleged abandonment.
Moreover, (even assuming, as the majority asserts, that the documentation establishing a 2007-2010 continued residence in the subject apartment was appropriately disregarded by the trial judge, despite landlord's own documentary evidence and the unrefuted testimony of tenant), by selectively focusing exclusively on the five-year period immediately prior to the expiration of the most recent renewal lease (which included the two [2] year legal sublease during 2005-2007), the trial court failed to give the required due consideration to the entire history of the lengthy tenancy, which spanned a period of approximately 40 years - more than half of tenant's lifetime (see 615 Co. v Mikeska, 75 NY2d 987 [1990]) and was not a "fair interpretation" of the evidence sufficient to warrant forfeiture of the subject rent stabilized apartment. Thus, giving landlord every favorable inference of the evidence in the record, and, after consideration of the undisputed cell phone records (which were introduced by landlord), tenant was absent from her New York apartment, at most, approximately only two (2) years (2005-2007)(which was indisputably permitted and consented to as a legal sublet under Rent Stabilization Law), and nine (9) months in 2010 (April-December 2010, of which she testified she returned for two weeks during such period), plus a few instances in 2008 (for ordinary vacations of short durations and several weekends for work purposes). 
Additionally, it was error for the trial court to rely on tenant's letter dated January 24, 2011 (written only three [3] weeks prior to the date of the notice of eviction), which requested, pursuant to the Rent Stabilization Law, landlord's permission to sublease the apartment for a two-year period, in order to undergo further "rather serious and lengthy medical treatment".[FN8] Notably, [*7]there is no bar against a rent stabilized tenant asking to sublease and, in fact, as indicated above, the Rent Stabilization Law explicitly permits tenants to exercise such right (see Rent Stabilization Code [9 NYCRR] § 2525.6). Further, such letter was a prospective expression of intention, requesting permission, which landlord denied, immediately commencing the within non-primary residence holdover proceeding. Thus, the letter was not dispositive on the issue of primary residence during the relevant period and it was improper for the judge to rely on it.
Significantly, it is undisputed that, instead of purchasing a home in Florida, or renting there long-term (and, thereby, arguably establishing a new primary residence in Florida), tenant's time in Florida was spent in short-term furnished rentals,[FN9]
or at various friends' homes, for short periods of time, further substantiating that there was no abandonment of the subject apartment and that tenant's primary residence always remained in New York, where she kept all her furniture and personal belongings, received mail, maintained her driver's license, voted and had her tax returns prepared (cf. 409-411 Sixth St., LLC v Mogi, 22 NY3d 875 [2013][where tenant owned a house in Vermont and acknowledged spending substantial time there, and such Vermont address was listed on her only driver's license]). This was buttressed by the proof that tenant's Sun Pass statements were mailed to her New York apartment, rather than any address in Florida.

Conclusion
Under the within circumstances, tenant, who is retired and a person of advanced years (76 years old), suffering from serious life threatening medical issues, should not be forced to forfeit her long-term principal residence in New York of 40 years, solely because she sought medical treatment in Florida, for reasons of personal concern, comfort and convenience (see Glenbriar Co. v Lipsman, 11 AD3d 352, 354 [1st Dept 2004], affd 5 NY3d 388 [2005][Appellate Term and Appellate Division nonetheless held, (with the Court of Appeals affirming), that tenant wife had a substantial nexus to her Bronx apartment, despite tenant wife spending half her time in Florida with her husband in the Florida coop they purchased together in both names with a Florida homestead tax exemption, and filing joint tax returns listing Florida as their primary residence]). Even if landlord was given the benefit of the doubt, by counting the two (2) year legal sublet (which was almost ten [10] years ago), as well as the nine months in 2010 (assuming her medical necessity claim was properly discounted), it only adds up to, at most, a total of two (2) years and nine(9) months, in contrast to 37 plus years of undisputed occupancy, as her primary residence, during her over 40 year tenancy.
Considering the totality of this elderly tenant's over 40-year tenancy and, under any fair interpretation of the record before the trial judge, which included, inter alia, undisputed testimony submitted by landlord of tenant's New York tax preparer that tenant's tax returns were [*8]prepared and filed in New York, her continued maintenance of her New York driver's license, cable, internet and telephone bills, Sun Pass records, pension, retirement, student loan and other financial statements - all listing the New York apartment as her address - as well as testimony that tenant voted in New York's elections [FN10], there was a substantial nexus to tenant's New York apartment and no abandonment of it as her primary residence. At minimum, a remand is in order, to evaluate the totality of the over 40-year tenancy, as the trial court's decision does not reflect a discussion as to tenant's entire tenancy and it does not appear that the considerable documentary evidence supporting tenant's nexus to her New York apartment was considered; nor was any consideration given to the Medicare statement, and the evidence submitted by landlord on its own prima facie case, which substantiated her medical treatment in Florida.

Decision Date: January 06, 2017



Footnotes

Footnote 1:Sun Pass records would keep track of tenant's usage of tolls in Florida, yet were sent to her New York apartment, rather than any of her temporary Florida addresses, evidencing a substantial nexus to New York and lack of a new primary residence in Florida.

Footnote 2:Tenant, who was 72 years of age at the time, testified that, while at home (during the long one [1] month adjournment), she suddenly remembered that she had Medicare records, which showed treatment in Florida, during the relevant period, and she simply called her attorney and asked her if she should bring such records to court, to which her attorney merely answered in the affirmative. This hardly qualifies as discussing the content of testimony, and, nevertheless, such a broad ban on any attorney/client contact for over one (1) month, during the course of any trial, when a party has not rested, would arguably affect such party's ability to adequately prepare a defense and any rebuttal.

Footnote 3:Letter of Dr. Richard Katz dated March 2, 2011, Katz Orthopedic Institute, Hudson Florida, attached as Exh. A to Harriette N. Boxer Affirmation in Opposition to Cross-Motion, dated May 11, 2012.

Footnote 4:"s/p (R) TKR" symbols stand for, Status Post (Right) Replacement Total Knee(see 1 Dan J. Tettenhouse, Attorneys Medical Deskbook §§ 5:20 — 5:22 [4th ed 2015]). This doctor's note substantiated tenant's testimony that, after she had knee replacement surgery, she further injured herself, by falling at her friend's home, on Memorial Day, and required further recuperation in Florida. 

Footnote 5:It is noted that while the majority mentions what was argued at oral argument before the Appellate Term, notably, only one member of the majority was actually present on the oral argument date, and the dissent only received notice of the substitution via receipt of the recent signed majority per curium decision, received on December 9, 2016.

Footnote 6:While such records are in the name of "Ruby Morgan" and mailed to an address in Westchester, it was, in fact, landlord who put forth such records as tenant's cell phone records of her usage on its prima facie case, without dispute.

Footnote 7:Permitting the usage of legal sublets under Rent Stabilization Law to then be used in non-primary residence holdover proceedings as proof of abandonment would encourage landlords to give "consent" under the Rent Stabilization Law to legally sublet, with the motive of then using such a legal sublet period against the tenant, in a subsequent non-primary residence holdover proceeding - a result not intended by the legislature.

Footnote 8:Tenant explained that her dire statement in the January 24, 2011 letter that, "it is possible I may never be able to return" was a reference to her potentially fatal diagnosis of "precondition for multiple myeloma", and her concern that she might not live. Moreover, tenant indicated that her intended relocation to Florida, at a "fully furnished rental" that she had subleased, was for the medical purposes, in that, Florida was "simply an easier place in which to go through what [she] was facing," and that she had "friends there who [could] assist [her] recovery and rehabilitation." Notably, tenant also stressed in such letter that her "stay in Florida is absolutely temporary", that all her "furnishings and household items [would] remain in the apartment", that her "bank account and driver's license continue to be in New York" and that she would continue to vote in New York elections. Thus, the letter cannot support an inference that tenant intended to abandon her New York apartment and permanently relocate to Florida.

Footnote 9:This was supported by landlord's submission of tenant's JP Morgan statements, which show that she had two (2) temporary Florida addresses, for only one (1) month intervals.

Footnote 10:Although it was pointed out that tenant voted "absentee" in New York, it is consistent with someone of her age, having medical issues and ambulatory difficulties, to vote absentee. Further, given the lengths to which one must engage in to vote absentee in New York, it demonstrates that tenant maintained a strong nexus to New York, such that she still wanted to affect its electoral outcome, rather than Florida.